UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

No. 93-8207
_____

IN THE MATTER OF:   CHARLES R. WALDEN, JR. and
                    LAURA H. WALDEN,

                                             Debtors.


                    CHARLES R. WALDEN, JR., and
                      LAURA H. WALDEN, a/k/a
                      Laura Hill Walden,

                                             Appellants,


                            versus

                    MAC H. McGINNES, JR.,

                                             Appellee.

_____

            Appeal from the United States District Court
                for the Western District of Texas
_____
                       (January 13, 1994)

Before GOLDBERG, JOLLY, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

     Charles and Laura Walden appeal from the denial, by the
bankruptcy and district courts, of their claimed exemption for an
annuity pursuant to Tex. Ins. Code art. 21.22.  We **REVERSE** and
**RENDER** judgment allowing the exemption.

                              I.

     Prior to 1986, Charles Walden, Jr., was employed in his
family's funeral business, consisting of Cook-Walden Funeral Homes
(a partnership owning funeral homes) and Capital Parks, Inc. (a

corporation owning a cemetery).[1]  In December 1986, Golden Era Services, Inc. (GES), purchased the assets of the partnership and corporation.  In connection with that purchase, GES entered into employment agreements and non-competition agreements with three "key employees":  Walden, Walden's father, and Hortense Fisher.[2]

Walden's employment contract was for a period of ten years, in an "executive capacity"; but the non-competition agreement was for a period of 40 years.  Under the latter, he was to receive $4,000 per month for 200 months, secured by mortgage liens on the funeral home land and buildings, and a lien on the name "Cook-Walden Funeral Homes".

Pursuant to the employment agreement, Walden began working for GES on December 29, 1986.  But, in October of the next year, he was placed on an indefinite leave of absence, and GES ceased making payments to him under the non-competition agreement.[3]  Walden, his father, and Fisher sued GES in state court, claiming breaches of the employment and non-competition agreements.  The suit was settled in 1988, with the parties entering into a settlement agreement that April.  That agreement provided that non-competition payments would recommence, that Walden would resign from his

---

[1]    Walden was not a partner in Cook-Walden Funeral Homes, but owned stock in Capital Parks.

[2]    Fisher also owned stock in Capital Parks.

[3]    In a letter to Walden, GES stated that it had placed him on indefinite leave of absence to investigate a "possible breach of [his] fiduciary duties" in connection with the discovery that money was being taken from the business without authorization. GES did not accuse Walden of taking money, but stated that he, as a "key employee", may have been aware of the situation.

executive position, effective retroactively to October 2, 1987, and that the non-competition agreements would be amended to provide that GES *could* substitute an annuity for the liens securing its obligations under those agreements.[4]  Accordingly, the non-competition agreement was then so amended (April 1988).

Neither the settlement agreement nor the amendment to the non-competition agreement *required* GES to purchase annuities for Walden or the other two key employees; nor did GES purchase annuities when the settlement was finalized in April 1988.  In October of that year, however, GES purchased annuities for the three key employees, thereby obtaining the release of all of the collateral securing its obligations under the non-competition agreements.

Walden and his wife filed a bankruptcy petition in September 1991.  They listed the annuity (with Principal Life Insurance Company) as an asset, and claimed it as exempt.  The exemption was claimed under Article 21.22 of the Texas Insurance Code, which allows an exemption for, *inter alia*, benefits received "under any plan or program of annuities and benefits in use by any employer".  Tex. Ins. Code art. 21.22 (West Supp. 1991).  The Trustee objected to the exemption.

The bankruptcy court sustained the objection, holding that the annuity did not qualify as exempt property because, *inter alia*, it did not "represent a plan or program of annuities and benefits in

---

[4]    The settlement agreement also provided that GES would pay Walden $61,500, in 12 monthly installments beginning April 30, 1988; and that Walden would return 50,000 shares of GES stock to GES upon receipt of $275,000, to be paid in 12 monthly installments commencing April 30, 1988.  These payments are not in issue.

- 3 -

use by any employer", in that it was purchased in connection with the settlement of litigation and GES was not Walden's employer at the time of purchase. *In re Walden*, 144 B.R. 54, 57 (Bankr. W.D. Tex. 1992). After reviewing the record, the district court affirmed, without rendering an opinion.

## II.

We review the bankruptcy court's findings of fact for clear error, but review freely questions of law. Bankruptcy Rule 8013; *Matter of Herby's Foods, Inc.*, 2 F.3d 128, 130 (5th Cir. 1993). The relevant facts are not in dispute. The sole issue is one of law, a question of statutory interpretation: whether the annuity qualifies as exempt property under art. 21.22.

The parties have not cited, nor have we found, any Texas cases interpreting the provisions of art. 21.22 in a context analogous to the one at hand. Nevertheless, we are given more than firm guidance in our interpretation by the Texas courts' longstanding admonition that exemption statutes are to be liberally construed in favor of the claimant. The Texas Supreme Court has stated that

> "our exemption laws should be liberally construed in favor of express exemptions, and should never be restricted in their meaning and effect so as to minimize their operation upon the beneficent objects of the statutes. Without doubt the exemption would generally be resolved in favor of the claimant."

*Hickman v. Hickman*, 149 Tex. 439, 234 S.W.2d 410, 413-14 (1950) (quoting *Carson v. McFarland*, 206 S.W.2d 130, 132 (Tex. Civ. App.--San Antonio 1947, *writ ref'd*).[5]

The Bankruptcy Code provides that, when a bankruptcy case is commenced, all property in which the debtor has a legal or equitable interest becomes property of the bankruptcy estate, 11 U.S.C. § 541, but that debtors may exempt certain property from the claims of creditors. 11 U.S.C. § 522. Depending on state law, debtors may claim either the federal exemptions enumerated in 11 U.S.C. § 522(d), or those available under applicable state or local law. *Matter of Volpe*, 943 F.2d 1451, 1452 (5th Cir. 1991). Texas debtors may elect either the state or federal exemptions. *Id*.

The Waldens elected the Texas exemptions. Among those available under Texas law is art. 21.22, entitled "Unlimited

---

[5]     In *Matter of Fernandez*, 855 F.2d 218 (5th Cir. 1988), our court observed that Texas' rule of liberal construction had led one Texas court to conclude that

> a dray is a "wagon" ... an automobile is a "carriage" ... a piano is "household and kitchen furniture" ... [and] the word "horse" includes a bridle and saddle, as well as the shoes on its feet and the rope and martingales around its neck.... And this spirit of liberal construction has been indulged until [the courts] have held that an unbroken colt is a "horse" ... and even that a mule, removed as he is one degree by consanguinity, is nevertheless a "horse." Furthermore, in their effort to extend the humane and beneficial character of [their] exemption statute, [Texas courts] have become so blind to every other consideration that they have looked upon the mule's father and  pronounced him -- voice, ears, and all -- a horse.

*Id*. at 219 (quoting *Patterson v. English*, 142 S.W. 18, 19 (Tex. Civ. App.--Amarillo 1911, no writ).

Exemption of Insurance Benefits From Seizure Under Process", which

provides, in pertinent part:

> Sec. 1.    *Notwithstanding any provision of this code other than this article*, all money or benefits of any kind ... to be paid or rendered to the insured or any beneficiary under any policy of insurance issued by a life, health or accident insurance company, ... *or under any plan or program of annuities and benefits in use by any employer*, shall:
>
> (1)  inure exclusively to the benefit of the person for whose use and benefit the insurance is designated in the policy;
>
> (2)  be  fully  exempt  from  execution, attachment, garnishment or other process;
>
> (3)  be fully exempt from being seized, taken or  appropriated  or  applied  by  any  legal  or equitable process or operation of law to pay any debt  or  liability  of  the  insured  or  of  any beneficiary, either before or after said money or benefits is or are paid or rendered; and
>
> (4)  be fully exempt from all demands in any bankruptcy  proceeding  of  the  insured  or beneficiary.

(Emphasis added.)[6]  As stated, the Waldens claimed that the annuity

payments were exempt under art. 21.22.[7]

---

[6]    For a discussion of the import of the emphasized opening clause, see note 10, *infra*.

[7]    Article 21.22 was amended, effective September 1, 1993.  Tex. Ins. Code art. 21.22 (West Supp. 1994).  The amended version, with emphasis on the new language, provides, in pertinent part, for exemption of

> all money or benefits of any kind ... to be paid or rendered to the insured or any beneficiary under any policy of insurance *or annuity contract* issued by a life, health or accident insurance company, ... or under any plan or program of annuities and benefits in use by any employer *or individual*.

*Id.* (emphasis added).  Because we "must apply the law in effect at

A.

The Trustee claims that the annuity was created pursuant to settlement of litigation, and was therefore not a "true annuity" under **Matter of Young**, 806 F.2d 1303 (5th Cir. 1987). The debtor in **Young** was an attorney who had represented the plaintiffs in a death claim. **Id**. at 1304. Pursuant to a structured settlement of that litigation, the debtor (attorney) was to receive monthly payments from an annuity contract as attorney's fees. **Id**. at 1305. The debtor claimed that the annuity was exempt under Louisiana law.[8] **Id**. at 1306.

Our court noted that, while the payments were, strictly speaking, an "annuity", they also were accounts receivable; accordingly, it "pierce[d] the veil of th[e] arrangement to determine its true nature", **id**. at 1306, because "[i]t is the substance of the arrangement rather than the label affixed to it that determines whether the payments are exempt under the Louisiana statutes as proceeds from an annuity, or accounts receivable, and

the time that the debtors entered bankruptcy", **Matter of Volpe**, 943 F.2d at 1453, we do not apply this amended version. Nevertheless, the nature of the changes to art. 21.22 indicates that the Texas legislature intended to clarify its original intent with respect to the exemption of annuities, rather than to alter the substantive effect of art. 21.22. *See* **id.** Accordingly, the amendment comports with our conclusion that the legislature intended to make available an exemption for the annuity at issue.

[8]    The debtor relied on La. Rev. Stat. Ann. § 20.33 (West Supp. 1986) ("all proceeds of and payments under annuity policies and plans" "shall be exempt from all liability for any debt"), and La. Rev. Stat. Ann. § 22:647(B) ("[t]he lawful beneficiary, assignee, or payee ... of an annuity contract ... shall be entitled to the proceeds and avails of the contract against the creditors and representatives of the annuitant ....").

part of the bankruptcy estate". *Id*. at 1307. The funds that made up the principal of the annuity were part of the payment the debtor was entitled to receive as attorney's fees for services rendered; but the debtor elected to receive the fees in regular monthly payments over a 14-year period rather than in a lump sum. Accordingly, our court concluded that the annuity payments represented nothing more than installment payments on the debt owed to the debtor for attorney's fees. *Id*. Because the debtor retained a right against the purchaser of the annuity for the remaining principal owed, until the debt for his attorney's fees was paid in full, our court held that, in substance, the annuity was "nothing more than an account receivable, and not exempt from the bankruptcy estate". *Id*. at 1307.

*Young* is distinguishable in several respects. The most obvious distinction is that it dealt with Louisiana, not Texas, exemption statutes. Here, as noted, our interpretation is governed by Texas' well-settled policy of liberal construction. The litigation that was settled arose out of the employment relationship between GES and Walden, including GES's alleged breach of the non-competition agreement. And, most important, the annuity payments claimed to be exempt are not "accounts receivable" for services *already* performed by Walden. Rather, the annuity was purchased by GES for the purpose of obtaining a release of the liens securing its continuing (future) obligation -- as well as to fund that obligation -- to pay Walden $4,000 per month in exchange

for his *continued* (future) compliance with his agreement not to compete.[9]

We conclude, therefore, that the settlement agreement, which resolved Walden's lawsuit against GES and authorized GES to substitute an annuity for the collateral securing its continuing obligation under the non-competition agreement, does not preclude the annuity from being exempt under art. 21.22. Although the substitution of the annuity for the collateral was made possible by the settlement agreement, the annuity payments represent GES's obligations under the pre-existing non-competition agreement, the validity of which was simply reaffirmed by the settlement agreement.

B.

As stated, Walden's resignation was effective October 2, 1987; the annuity was not purchased until October 1988, after the employment relationship had ended. The bankruptcy court held that, because there was no employment relationship between GES and Walden at the time of purchase, the annuity was not "in use by" an employer, as required by art. 21.22.

This analysis overlooks the fact that the annuity payments represent GES's obligations under the non-competition agreement, which was entered into at the inception of Walden's employment with

---

[9] ***Daniels v. Pecan Valley Ranch, Inc.***, 831 S.W.2d 372 (Tex. App.--San Antonio 1992), *cert. denied*, ___ U.S. ___, 113 S. Ct. 2944 (1993), cited by the Trustee, is inapposite. That case involved a personal injury structured settlement annuity that the annuitant claimed was exempt from garnishment. ***Id***. at 375, 377. The annuitant did not contend that it was an annuity as contemplated by art. 21.22. ***Id***. at 380 n.2.

GES, and the validity of which was reaffirmed by the settlement agreement. Under Texas law, a non-competition agreement is valid only if it is ancillary to another relationship or transaction, reasonable, and supported by consideration. *Chenault v. Otis Engineering Corp.*, 423 S.W.2d 377, 382 (Tex. Civ. App. 1967, *writ ref'd n.r.e.*). Walden's employment relationship with GES is the only relationship to which the non-competition agreement can be ancillary.

The termination of Walden's employment relationship with GES was deemed to have been effective on October 2, 1987, only because the parties agreed to that through the settlement in 1988. When that agreement was executed in April 1988, Walden was on an indefinite leave of absence. Prior to execution of the settlement agreement and amendment of the non-competition agreement (required by the settlement), GES had no right to substitute an annuity for the collateral securing its obligations under the non-competition agreement. As noted, when GES obtained that right (through the April 1988 settlement), Walden was still on indefinite leave of absence from his employment with GES.

Therefore, the parties' April 1988 agreement to treat Walden's employment with GES as having terminated on October 2, 1987, and the fact that GES waited until October 1988 to purchase the annuity, cannot change the fact that the annuity payments represent GES' obligations to make monthly payments to Walden under the non-competition agreement, which was ancillary to his employment with GES. *See Chenault*, 423 S.W.2d at 382-83 (a covenant not to compete

- 10 -

was ancillary to employment even though it was executed at the time of termination of employment, and after the employee had gone to work for another employer). As a result, we conclude that GES purchased the annuity in its capacity as Walden's "employer", thus satisfying art. 21.22's requirement that the annuity be "in use by" an employer.

C.

Finally, the Trustee asserts that the annuity is not covered by art. 21.22 because it is not part of a "plan or program of annuities and benefits". Again, we disagree.

As noted, we must give a broad interpretation to the language of art. 21.22. *Black's Law Dictionary* (6th ed. 1990) defines "plan" as, among other things, "a method of design or action, procedure, or arrangement for accomplishment of a particular act or object". Likewise, "program" is defined as "a plan or system under which action may be taken toward a goal". *Webster's Ninth New Collegiate Dictionary* 940 (1990). Walden's annuity is one of three purchased by GES in order to arrange for the accomplishment of a particular "object" or "goal": funding the continuing/future non-competition payments and securing the release of its assets from the liens held by Walden and the other two key employees as collateral for those payments.

Article 21.22 covers "*any*" plan or program of annuities and benefits in use by an employer. Accordingly, it is not necessary that the plan or program provide annuities for *all* employees, or that it be of longstanding duration, or that it be of a particular

type (such as for retirement[10]).  *See **Hime v. City of Galveston***, 268 S.W.2d 543, 545 (Tex. Civ. App.--Waco 1954, *writ ref'd n.r.e.*) (emphasis in original) ("[P]articularly in construing statutes, the word `*any*' is equivalent to and has the same force of `*every*' and `*all*'").  In short, GES's provision of annuities to only three former employees does not make it any less a "plan" or a "program" within the meaning of art. 21.22.

Interpreting the statute liberally, as Texas law requires, we are more than satisfied that the annuity is part of a requisite "plan or program of annuities and benefits".

D.

Our interpretation is bolstered by other considerations.  The Waldens assert persuasively that equity requires exemption of the annuity because, had GES not purchased it, the post-petition non-competition payments would not have been property of the bankruptcy estate under 11 U.S.C. § 541(a)(6), which provides that "earnings from services performed by an individual debtor after the commencement of the case" are not property of the estate.[11]  *See **In***

---

[10]    The Trustee contends, based in large part on references to other portions of the Texas Insurance Code, that "plan or program" refers to retirement plans, not to the one in issue.  Article 21.22's opening clause ("Notwithstanding any provision of this code other than this article"), added when the statute was amended effective June 15, 1991 (a few months prior to the Waldens' bankruptcy petition), clearly directs that it be interpreted and applied independent of any other provisions of the Insurance Code.

[11]    The record on appeal, which includes the briefs submitted by the Waldens in the bankruptcy and district courts, does not reflect that this point was presented to either of those courts.  However, at oral argument, Waldens' counsel stated that it was presented during oral argument in district court; Trustee's counsel did not controvert that representation.  Obviously, this point should have

*re Hammond*, 35 B.R. 219 (Bankr. W.D. Okla. 1983) (holding that, because future non-competition payments were conditioned on the debtor's compliance with the covenant not to compete, and the debtor could not be compelled to perform services for the benefit of his creditors, post-petition non-competition payments were not property of the estate).[12]

We express no opinion whether, in the absence of an annuity, Walden's post-petition non-competition payments could have been excluded from the estate pursuant to § 541. Nevertheless, we are persuaded that sound practical reasons, as well as equitable ones, support our conclusion that the annuity is exempt.

---

been presented more fully in the bankruptcy court and presented in the briefs in district court. But, because it is not a separate issue, and instead is simply additional legal authority to consider in reaching our decision, we consider it here. *See United States v. Vontsteen*, 950 F.2d 1086, 1091 (5th Cir.) (en banc) ("We ordinarily have the discretion to decide legal issues that are not timely raised"), *cert. denied*, ___ U.S. ___, 112 S. Ct. 3039 (1992); *e.g., Atlantic Mut. Ins. Co. v. Truck Ins. Exch.*, 797 F.2d 1288, 1293 (5th Cir. 1986) ("An issue raised for the first time on appeal generally is not considered unless it involves a purely legal question or failure to consider it would result in a miscarriage of justice").

[12]   *Hammond* was distinguished in *In re Bluman*, 125 B.R. 359, 367 (Bankr. E.D.N.Y. 1991). The non-competition payments in *Bluman* were not conditioned upon compliance with the covenant not to compete, but instead became due upon the transfer of the debtor's business. *Id*. The *Bluman* court disagreed with *Hammond*'s conclusion that a court may not compel compliance with a covenant not to compete, pointing out that courts may enforce, by negative injunction, reasonable covenants not to compete. *Id*. It therefore held that the covenant not to compete was not a personal services contract and that the consideration paid for the covenant was not tantamount to earnings from services performed by the debtor. *Id*. Under the facts in the case before us, *Hammond* is the more persuasive authority.

The non-competition agreement provides that GES's obligation to make monthly payments to Walden is "subject to performance by [Walden]" of the covenant not to compete. Thus, payments to Walden under the annuity are subject to his future compliance with his agreement not to compete with GES. If Walden's creditors receive the annuity payments, Walden will have little, if any, incentive to refrain from competing with GES, thereby possibly depriving GES of the benefit of its bargain. Unless the Trustee is able to obtain the present value of the annuity in a lump sum, it is possible that GES could obtain judicial relief, terminating future monthly payments in the event that Walden breaches the covenant. Even if we assume, *arguendo*, that GES could be protected by an order compelling Walden to comply with the non-competition agreement, the result might well be considered inequitable, because it would deprive Walden of the ability to work in his chosen profession in the area where he resides, without any compensation for that deprivation.

In sum, these considerations support our interpretation of art. 21.22 as being consistent with Texas' policy of liberal construction of exemption statutes "to the end that the laborer should be allowed means of obtaining a livelihood, and thus prevent him and his family from becoming a charge on the public", ***J.M. Radford Grocery Co. v. McKean***, 41 S.W.2d 639, 640 (Tex. Civ. App.-- Fort Worth 1931, *no writ*), as well as the bankruptcy policy of providing debtors with a "fresh start". *See, e.g.,* ***Hammond***, 35 B.R. at 223.

III.

For the foregoing reasons, the judgment of the district court is **REVERSED**; and judgment allowing the exemption is hereby **RENDERED**.

**REVERSED and RENDERED**